IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| CARLOS ALVAREZ, JR., | : | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | : | CIVIL NO. 10-890 (JBS) |
| v. | : | |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | **OPINION** |
| Defendant. | : | |

APPEARANCES:

Adrienne Freya Jarvis, Esq.
800 North Kings Highway
Suite 304
Cherry Hill, NJ 08034
     Attorney for Plaintiff

Paul J. Fishman
UNITED STATES ATTORNEY
     By:  Joanne Jackson
          Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Suite 3904
New York, NY 10278
     Attorney for Defendant

**SIMANDLE**, District Judge:

## I.  INTRODUCTION

This matter comes before the Court pursuant to 42 U.S.C. §
1383(c)(3) which provides that the Court shall, pursuant to the
procedures set forth in 42 U.S.C. § 405(g), review the final
decision of the Commissioner of the Social Security
Administration denying Plaintiff Carlos Alvarez, Jr.'s

application for Supplemental Security Income under Title XVI of the Social Security Act.

At issue in this case is whether Alvarez's level of English proficiency required that an interpreter be provided for him in order to conduct a fair benefits hearing; whether the Administrative Law Judge ("ALJ") failed to accord the opinions of Alvarez's treating and consulting professionals the appropriate weight; and whether the ALJ's determination of Alvarez's credibility was proper.  For the reasons explained below, although the Court finds that no interpreter was needed for Alvarez, the Court will vacate and remand the case for reconsideration, principally because the ALJ failed to properly consider the opinions of Nurse Ann Martin and Dr. Lewis A. Lazarus.

## II.  BACKGROUND

Plaintiff, Carlos Alvarez, Jr., is a 48-year-old man, who was born in New York and raised in Camden, N.J.  (Administrative Record ("A.R.") 198.)  He completed schooling through the eighth grade.  (A.R. 29 ¶ 3.)[1]  He testified that he was placed in special education during his schooling.  (A.R. 29 ¶ 3.)  He worked as a kitchen helper and porter for 15-20 years at some

---

[1]  The exact grade through which Alvarez completed his schooling is unclear from his conflicting statements in the record, varying from seventh to tenth.  (A.R. 36. ¶ 3.)

2

time prior to 2004.  (A.R. 37.)  He seeks Supplemental Security Income because he claims to be unable to work due to his anxiety disorder.

In order to be eligible for Supplemental Security Income, an individual must demonstrate that he or she is unable to engage in any substantial gainful activity due to any medically determinable physical or mental impairment which has lasted, or can be expected to last, for a continuous period of at least twelve months.  42 U.S.C. § 1382c(a)(3)(A).  A disabling physical or mental impairment is defined as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § 1382c(a)(3)(D).  An individual will be determined to be under a disability only if his impairment is of such severity that he is not only unable to do his previous work, but also cannot, given his age, education, and work experience, engage in any other kind of substantial gainful work.  42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has promulgated regulations for determining disability that require application of a five-step sequential analysis.  20 C.F.R. § 416.920.[2]  It is the claimant's burden to

---

[2]  If not suffering from a severe impairment, the Plaintiff will be found not disabled.  If the severe impairment meets or equals a listed impairment and has lasted or is expected to last for a continuous period of at least twelve months, the claimant will be found disabled.  If the claimant is still able to perform

show that he or she is severely impaired, and either that the severe impairment meets or equals a listed impairment and lasts for the requisite duration, or that it prevents the claimant from performing the claimant's past work.  Wallace v. Secretary of Health and Human Services, 722 F.2d 1150, 1153 (3d Cir. 1983). If he or she meets those burdens by a preponderance of the evidence, the Commissioner bears the burden of proving that work is available for the claimant: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform." Kangas v. Bowen, 823 F.2d 775, 777 (3d Cir. 1987).  Ultimately, entitlement to benefits is dependent upon finding the claimant is incapable of performing work in the national economy.

Alvarez filed claims for disability benefits on March 31, 2004, alleging he was disabled beginning July 1, 1998 because of anxiety and nervousness.  (A.R. 24.)  The claims were denied initially on November 12, 2004, and again on reconsideration on

---

work done in the past despite the severe impairment, the Plaintiff will be found not disabled.  Finally, the Commissioner will consider the claimant's ability to perform work, age, education, and past work experience to determine whether or not the claimant is capable of performing other work which exists in the national economy.  If incapable, the claimant will be found disabled.  If capable, the claimant will be found not disabled. 20 C.F.R. § 404.1520(b)-(f).

April 13, 2005. (A.R. 44-46, 52.)  Plaintiff filed a request for
a hearing before an ALJ on May 27, 2005.  (A.R. 56.)

A hearing was held on August 1, 2006.  (A.R. 24.)  The ALJ
found that Alvarez had not engaged in substantial gainful
activity at any time since March 31, 2004.  (A.R. 25.)  The ALJ
also found that Alvarez suffers from three severe impairments: a
depressive disorder, an anxiety-related disorder, and has a
history of substance abuse (that was "not a significant factor
material to the finding of disability."). ((A.R. 26.)[3]

Because the ALJ concluded that none of the three impairments
meets or equals a listed impairment, he assessed Alvarez's
residual functional capacity.  (A.R. 26-27.)  In assessing
Alzarez's residual functional capacity, the ALJ made a number of
important findings.  He found that there was no evidence any
severe physical impairments.  (A.R. 30.)  And he found that the
record shows that Alvarez can perform work involving simple,
repetitive tasks and simple instructions.  (A.R. 30.)  The ALJ
found that although Alvarez testified that he hears voices, feels
isolated, and has panic attacks, Alvarez also testified that when
taking medicine he does not hear voices, and that he has fewer
panic attacks.  (A.R. 29.)  Alvarez testified that he was never

---

[3]  Alvarez had also referred to having problems with asthma,
but the ALJ found no record support for this condition being a
severe impairment.  That finding is not challenged in this
action.

hospitalized for his mental symptoms.  (A.R. 29.)  Citing many parts of the extensive examination record, the ALJ found, "Despite the claimant's assertions to the contrary, the medical record does not support the claimant's impairments are as severe as he contends."  (A.R. 30.)

Ultimately, the ALJ denied the claim because he found, with the aid of testimony of a vocational expert, that Plaintiff retains enough residual functional capacity to return to his work as a kitchen helper or porter.  (A.R. 37.)  The ALJ also found that even if Alvarez could not return to his past work, he could find work existing in significant numbers in the national economy.  (A.R. 38.)

Plaintiff sought review of this decision by Appeals Council. The Appeals Council declined to review the case.  (A.R. 10.)  On October 6, 2009, present counsel submitted additional evidence. (A.R. 8.)  On December 23, 2009, the Appeals Council set aside their earlier action, and after considering the additional evidence, again denied request for review.  (A.R. 5.)  Plaintiff then filed the present action.

## III. DISCUSSION

### A.    Standard of Review

Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny benefits.  <u>See</u>

<u>Ventura v. Shalala</u>, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual findings where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); <u>Fargnoli v. Massanari</u>, 247 F.3d 34, 38 (3d Cir. 2001).  Substantial evidence means more than "a mere scintilla." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Id.</u>

To facilitate this Court's review, the ALJ must set out a specific factual basis for each finding.  <u>Baerga v. Richardson</u>, 500 F.2d 309 (3d Cir. 1974), <u>cert. denied</u>, 420 U.S. 931 (1975). Additionally, the ALJ "must adequately explain in the record [the] reasons for rejecting or discrediting competent evidence," <u>Ogden v. Bowen</u>, 677 F. Supp. 273, 278 (M.D. Pa. 1987).

### B.  Analysis

#### 1.  Alvarez's English Proficiency

##### a.  Legal standard

One of the most important of the ALJ's responsibilities is "to develop a full and fair record."  <u>Ventura</u>, 55 F.3d at 902; <u>see also</u> <u>Johnson v. Barnhart</u>, 66 Fed. App'x 285, 289 (3d Cir. 2003).  Even though the burden is on the claimant to prove a disability, "an ALJ must secure relevant information regarding a

claimant's entitlement to social security benefits."  Ventura, 55 F.3d at 902.

The Social Security Administration's Program Operations Manual advises ALJs that an individual "who has limited or no ability to read, write, speak or understand English" may need an interpreter and that the ALJ is to "[p]rovide an interpreter whenever it is difficult to understand the individual, or when it is evident that language assistance is required to ensure that the individual is not disadvantaged, even if the individual does not request an interpreter."  Social Security Online, POMS Section DI 23040.001, available at, https:// secure.ssa.gov/apps10/poms.nsf/lnx/0423040001.

Although the Program Operations Manual does not have the force of law, generally a violation of the interpreter policy is viewed as a failure to provide a full and fair hearing.  See Novikov v. Astrue, No. C07-5415BHS, 2008 WL 4162941, at *5 (W.D. Wash., Sept. 2, 2008) (remanding when it was clear that interpreter needed for ALJ to fully and fairly develop the record); Di Paolo v. Barnhart, No. 01-CV-3123, 2002 WL 257676, at *5-6 (E.D.N.Y., Feb. 8, 2002) (remanding based on denial of interpreter); see also Martinez v. Astrue, No. 3:07cv699, 2009 WL 840661, at *2 n.2 (D. Conn. Mar. 30, 2009) ("[T]raditional notions of due process would suggest that without an interpreter a claimant unable to communicate in English would hardly receive

a full hearing in accordance with the beneficient purposes of the Act.") (internal quotation and citation omitted).[4]

The standard for determining whether an interpreter was needed is a practical one, often examining the following factors: (1) the claimant's self-reported language ability on the disability report form and at the hearing; (2) the claimant's apparent ability to converse at the disability hearing; and (3) whether the claimant was represented by counsel. See Novikov, 2008 WL 4162941 (remanding where transcript of hearing made it plain that an interpreter was needed because unrepresented claimant made plainly nonsensical statements or clearly misunderstood questions); Di Paolo, 2002 WL 257676 (remanding because unrepresented claimant specifically requested an interpreter because — consistent with her disability application — she spoke only a little English, but was denied one); Xu v. Barnhart, No. CV-04-3927, 2006 WL 559263 (E.D.N.Y. Mar. 7, 2006) (denying remand based on unrepresented claimant's statements on his disability report that he could speak English, and based on the transcript of the hearing); Guglielmo v. Barnhart, 2003 WL 21749782 at *4 (S.D.N.Y., July 29, 2003) (denying remand because claimant's disability report said he could speak English, he was

_____

[4]   The Court understands the failure to use an interpreter for consulting examinations to go to the weight of that evidence rather than the fairness of the hearing.  The Court therefore separately addresses whether the ALJ erred in relying on consulting examinations conducted without an interpreter.

represented by an attorney, and he never informed the ALJ of language problems during the hearing); Castillo v. Shalala, No. 93 CIV. 7805, 1995 WL 598977 at *3 (S.D.N.Y., Oct. 10, 1995) (denying remand because claimant was represented by counsel and substantial evidence supported the Secretary's determination that Plaintiff understands English).  Ultimately, the question is whether the claimant, under the circumstances, was disadvantaged in the hearing by his or her language difficulties.

In order to find that an interpreter was needed based on the transcript of the hearing, the misunderstandings must rise above the normal misstatements or clarifications involved when even fluent English speakers converse.  Having to ask a question twice to get a clear answer, or to ask a question in a different way does not itself suffice to show that the lack of an interpreter has disadvantaged a claimant, since introducing an interpreter does not render all communication flawless and brings its own communication challenges.  Some greater problem of understanding is needed to show that an interpreter was necessary.  See, e.g, Novikov, 2008 WL 4162941, at *4 (finding an interpreter was necessary because, among dozens of other similar examples, when asked, "How do you spend your time?  What do you do all day?" the claimant responded, "Oh, if, if I feel myself let down, I, I console him for finding it.").

10

b.  Assessment of Alvarez's proficiency

In this case, there is evidence that Alvarez did not speak fluent English, and had extremely limited or no English literacy. In 2004, the Commissioner requested that Alvarez be evaluated by Dr. David Bogacki, Ph.D., using two standard tests:  the Psychological III and Wechsler Memory Scale.  Dr. Bogacki reported that Alvarez "does not speak sufficient English for these examination to be conducted," and that Alvarez told Dr. Bogacki that he speaks better Spanish than English.  (A.R. 195.) Dr. Lewis A. Lazarus, Ph.D. noted that Alvarez's "[r]eceptive language functions. . . appeared to be poorly developed, particularly with respect to reading," and that he "needed several explanations of the directions in order to perform [an assigned task] correctly at all," but makes no mention of this being a consequence of his limited English rather than his emotional or mental impairments.  (A.R. 200 ¶2.)  Nurse Ann M. Martin, a psychiatric/mental health nurse, filled out a premade form with the category for  "read/write/speak English" marked as "extremely impaired," though she included the explanatory notation "can't read."  (A.R. 261.)

But there is also substantial evidence that Alvarez's spoken English is proficient.  Dr. Klausman examined Alvarez, who was able to fully relay and explain his impairments, without the aid of an interpreter, and Dr. Klausman made no mention of Alvarez's

11

English skills.  (A.R. 180-83.)  Dr. Dubro, who examined Alvarez in March 2005, found that "his speech intelligibility was fluent," and his "expressive and receptive language adequate." (A.R. 228.)  Dr. Curran noted that Alvarez's social worker said he could speak English well.  (A.R. 216.)

The fact that Alvarez speaks better Spanish than English is not dispositive of the question of whether his hearing was unfair.  Nor is it relevant how well Alvarez could read and write in English.  Instead, the question is whether Alvarez could speak and understand English sufficiently to avoid being disadvantaged by not having an interpreter.  POMS Section DI 23040.001.  And having insufficient English skills to have language-based psychological batteries yield scientifically accurate results, or to grasp examination instructions without ever needing clarification, does not necessarily mean that Alvarez was not provided a full and fair hearing without an interpreter.

All three of the relevant factors identified above — the claimant's own indications of his language ability, the transcript of testimony, and the presence of an attorney for the claimant — counsel against remand based on the failure to provide an interpreter.  First, in his April 18, 2004 Disability Report, Alvarez indicated that he could speak English.  (A.R. 107.)

Second, despite a handful of misunderstandings involving the names and titles of Alvarez's many medical providers, he

conversed in English easily at his August 1, 2006 hearing.  (A.R. 431-448.)  Alvarez indicated that he has trouble reading and writing in English, but when asked by his own attorney "But, obviously, you can speak the English language?" he offered an unqualified "Yes."  (A.R. 432.)

The portions of the conversation that Alvarez claims are proof that he was disadvantaged by the lack of an interpreter are not persuasive.  Alvarez restated the definition of the word "physical," for example, to clarify that the ALJ was distinguishing between his anxiety impairments and any problems with the rest of his body.  (A.R. 438-440.)  Alvarez at one point referred to one of his doctors as a nurse.  (A.R. 441-43.)  He points to an exchange in which Alvarez was unclear about the name of one of his treating doctors.  (A.R. 439-440.)  These incidents were limited (including only a single instance in which anyone believed Alvarez did not understand a question), were all ultimately clarified, and in any case appear to be a consequence of the ordinary miscommunications that occur in any extended conversation with an individual of Alvarez's level of mental functioning, rather than some difficulty with spoken English. The answers to questions upon which the ALJ relied were all easily understood and clearly answered questions.  For example, the ALJ and Alvarez had the following exchange: "So when you take the medication you don't hear the voices that you --" "Yeah"

"–just–" "I don't hear the voices and stuff like that."  (A.R.
445.)  At no point did Alvarez seek clarification of a question.
There were no more apparent misunderstandings in the interview
than are present in such interviews with native English speakers,
and none of the moments of disconnect are clearly attributable to
Alvarez's language abilities.

Finally, Alvarez was represented by counsel at the hearing,
who the Court may presume was protecting Alvarez's interests.
None of the three individuals who were actually present and in
the best position to judge whether there were language
difficulties felt that an interpreter was needed at that time.

The Court declines to remand to provide an interpreter.
Since the Court will be remanding for other reasons, however, the
ALJ should consider whether, in light of Alvarez's concerns
raised before this Court, any testimony needs to be re-taken with
aid of an interpreter.

### 2.  Review of ALJ's findings for substantial evidence

As noted earlier, this Court reviews the ALJ's factual
findings to determine whether they are supported by "substantial
evidence," Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001),
meaning "such relevant evidence as a reasonable mind might accept
as adequate to support a conclusion."  Richardson v. Perales, 402
U.S. 389, 401 (1971).  Critically, as noted above, the ALJ "must

14

adequately explain in the record [the] reasons for rejecting or
discrediting competent evidence." Ogden, 677 F. Supp. at 278.
Plaintiff challenges the ALJ's findings in this respect as to a
number of points, including the ALJ's evaluation of various
examiners' opinions and the ALJ's assessment of Alvarez's
credibility.  Plaintiff does not dispute the ALJ's residual
functional capacity findings with regard to Plaintiff's physical
impairments.

### a.  Evaluation of medical opinions

#### i.  Dr. Oehlberg

The ALJ acknowledged that Dr. Susan M. Oehlberg, Alvarez's
treating psychologist, had diagnosed Alvarez with a major
depressive disorder in 2005.  (A.R. 33; A.R. 259.)  However, the
ALJ also noted that Dr. Oehlberg's report of January 26, 2006
showed significant improvement in Alvarez's so-called Global
Assessment Functioning ("GAF") score, and that by May 25, 2006,
his score indicated only moderate symptoms.  (A.R. 33; A.R. 266.)

Alvarez contends that the characterization of Dr. Oehlberg's
opinions as showing improvement to merely a moderate impairment
was based on cherry-picked information from Dr. Oehlberg's
assesments.  The Court disagrees.  On the contrary, this
assessment is entirely representative of the rest of Dr.

Oehlberg's explicit findings, which were that Alvarez's "symptoms are resolving."  (A.R. 366.)

Alvarez also contends that the GAF scores do not directly correlate to whether an impairment is severe for the purposes of Supplemental Security Income.  The Court agrees that an impairment can be severe, as used in the regulations, at high ranges of GAF, or not severe at low ranges, but that does not mean that GAF scores are not relevant and reliable evidence, consistent with how the ALJ used them.

While Alvarez characterizes the ALJ as having largely ignored Dr. Oehlberg's opinion, this is simply not the case.  The ALJ found that Dr. Oehlberg's opinion was consistent with Alvarez having some severe impairments that were nevertheless not so debilitating as to prevent his work as a kitchen helper or porter.

### ii.  Nurse Martin

Ann Martin, an Advance Practice Registered Nurse, filled out a work-related activity assessments for Alvarez in November 2005. (A.R. 261-62.)  She assessed Alvarez as being extremely impaired with respect to his ability to complete tasks in a timely manner, maintain attention for extended periods, perform activities within a schedule, and sustain tasks without an unreasonable number of breaks.  (A.R. 261.)  She also found him to be markedly

16

impaired with respect to other important jobs skills, such as understanding and carrying out detailed instructions, working with or near others without being distracted, and responding appropriately to changes and stress.  (A.R. 262.)

The ALJ gave no weight to Ms. Martin's opinion, having found that Ms. Martin was not an acceptable medical source under 20 C.F.R. § 416.913(a), which states, "We need evidence from acceptable medical sources to establish whether you have a medically determinable impairment(s)," and lists acceptable medical sources and does not include nurses.

However, the regulation goes on to state that "In addition to evidence from the acceptable medical sources listed in paragraph (a) of this section, we may also use evidence from other sources to show the severity of your impairment(s) and how it affects your ability to work."  § 416.913(d)(1) (emphasis added).  These sources include nurse practitioners like Ms. Martin, as well as spouses, parents, and other sources.

Alvarez correctly argues that it was error to entirely disregard Ms. Martin's opinion without further discussion.  On August 9, 2006 (over a month before the ALJ's determination), the Social Security Administration promulgated Social Security Ruling ("SSR") 06-03p which clarified how evidence presented by "other sources" should be evaluated.  See SSR 06-03p, 2006 WL 2329939 (S.S.A.), at *1, *3 (2006).  This Ruling was binding on

the ALJ.  <u>Walton v. Halter</u>, 243 F.3d 703, 708 (3d Cir. 2001)

(citing 20 C.F.R. § 402.35(b)(1)).  The Ruling states that

"Opinions from these medical sources, who are not technically

deemed 'acceptable medical sources' under our rules, are

important and should be evaluated on key issues such as

impairment severity and functional effects, along with the other

relevant evidence in the file," and "require[s] consideration of

such evidence when evaluating an 'acceptable medical source's'

opinion."  SSR 06-03p at *3-4.

The failure to address the factors set forth by SSR 06-03p

requires remand.  <u>Magno v. Astrue</u>, Civil Action No. 08-1543, 2010

WL 322144, at *5 (W.D. Pa. Jan. 27, 2010) (remanding because ALJ

failed to consider SSR 06-03p, and gave opinion minimal weight

because it was not from an acceptable medical source).  <u>See also</u>

<u>Pulos v. Astrue</u>, Civil Action No. 09-142, 2010 WL 2367504, at *12

(W.D. Pa. June 9, 2010) (same); <u>Echtinaw v. Astrue</u>, No.

C09-0024-RSL, 2009 WL 3245468 (W.D. Wash., Oct. 6, 2009).  On

remand, the ALJ should consider Ms. Martin's opinion as required

by SSR 06-03p.

### iii.  Dr. Nguyen

In a report dated March 6, 2004, Dr. Bao Nguyen, who had

treated Plaintiff since 1997, diagnosed Alvarez with "anxiety."

(A.R. 178.)  Dr. Nguyen opined, without further explanation, that

18

Plaintiff could not work full time for a period of approximately three months. (A.R. 179.)  Dr. Nguyen also filled out an agency form, and checked boxes indicating that Alvarez suffered from problems with understanding and memory, sustained concentration and persistence, social interaction, and adaption, but failed to follow the form's instructions to describe and explain each limitation.  (A.R. 224-25.)

The ALJ properly found that Dr. Nguyen did not opine as to the nature or severity of the mental impairments experienced by Alvarez, or their effect on his ability to function in a work environment. (A.R. 31.)  Without such explanations or descriptions, the opinion is not entitled to controlling weight, and even if it were, it offered the ALJ nothing to go on but the doctor's bare conclusion regarding some apparently temporary three-month disability.  Even if given controlling weight, it is not clear that any of Nguyen's opinions conflict with the ALJ's determinations.

### iv.  Dr. Dubro

The ALJ relied on the opinion of Dr. Alan Dubro, who found Alvarez to have had intermittent anxiety problems in the past, but to not currently have them.  (A.R. 32.)  Alvarez argues that Dr. Dubro's opinion regarding Alvarez's euthymic mental status is inconsistent with "virtually every other piece of medical

evidence in the record," and that the ALJ failed to address or reconcile the inconsistencies.

In fact, the ALJ ultimately disagreed with Dr. Dubro and found that Alvarez did suffer from a severe anxiety-related impairment, but found that the impairment did not so reduce Alvarez's capacity as to make him disabled.  And, in any case, Alvarez identifies only two minor inconsistencies that are not the type that must each be identified and explained.

First, Alvarez notes that Dr. Dubro found Alvarez's "speech intelligibility was fluent.  The quality of his voice was clear.  His expressive and receptive language was adequate." (A.R. 228.) Alvarez contrasts this with Dr. Lazarus's finding that "receptive language functions also appeared to be poorly developed, particularly with respect to reading."  (A.R. 200.)  And Dr. Bogacki found that Alvarez "does not speak sufficient English for these examination to be conducted," and that Alvarez told Dr. Bogacki that he speaks better Spanish than English.  (A.R. 195.) Alvarez apparently sees an inconsistency between receptive language being adequate, and it being poorly developed or insufficient for scientific testing, but the Court sees no obvious inconsistency.  Even if there is one, it is minor, especially given that Dr. Lazarus's assessment emphasizes Alvarez's reading skills while it is not clear that Dr. Dubro's did so.

The second purported inconsistency involves Alvarez's
ability to count by 3's.  Dr. Dubro reported that, in March of
2005, Alvarez's "concentration and attention are intact. He was
able to do counting, simple calculations, and serial 3's. His
recent and remote memory skills were intact. He was able to
recall three objects immediately after five minutes; he restated
4 digits backward." (A.R. 229.)  However, Dr. Ken Klausman
reported in June 2004 that Plaintiff "is not able to count
backwards from a hundred by threes." (A.R. 182.)  Similarly, Dr.
Lazarus stated in August 2004 that Alvarez "could not do serial
3's." (A.R. 200.)  Whether Alvarez can count by 3s is only a
subset of the evidence regarding his mental abilities; as to the
wider conclusion, Dr. Lazarus agreed that Alvarez was able to do
counting and simple calculations.  (A.R. 200.)

v.  Dr. Bogacki

As previously mentioned, in 2004, Dr. David Bogacki, Ph.D.,
was tasked with evaluating Alvarez using two standard tests:  the
Psychological III and Wechsler Memory Scale.  But Dr. Bogacki did
not conduct the tests because of Alvarez's level of English
proficiency. (A.R. 195.)  Instead, Dr. Bogacki administered a
non-verbal test called the Raven Progressive Matrices test, a
test of abstract reasoning.  Alvarez scored so poorly and
inconsistently with other indications of his mental functioning

that Dr. Bogacki could not confirm the validity of the result, opining that "[i]t is unclear whether the claimant's lack of effort, language difficulties or visual problems may have had an adverse impact upon the testing."  (A.R. 197, ¶2.)

Although Alvarez characterizes the ALJ's opinion as having relied extensively on Bogacki's report, this is incorrect.  The ALJ noted: "the doctor commented that the claimant did not present as mentally deficient.  Dr. Bogacki also stated that Mr. Alvarez's attitude and effort on testing was very questionable.  Despite the claimant's allegations of being depressed and anxious, the doctor found the claimant's affect and mood to be within normal limits."  (A.R. 31.)

Alvarez contends that Raven test required English proficiency because the instructions are not obvious.  Even if that is so, it is irrelevant.  The ALJ relied on the test results only insofar as he noted Bogacki's questioning of Alvarez's incorrect answers on even those parts of test that Bogacki opined were "extremely easy items" and that he personally explained — evincing a mental functioning level far below what any source has suggested.  Otherwise, the ALJ relied solely on Bogacki's personal observations of Alvarez's affect and presentation.

Since the matter will be remanded anyway, the Court instructs the ALJ to consider whether there is sufficient evidence to find that lack of effort rather than language

difficulties explained the test results, and if not whether any
of the ALJ's conclusions are thereby altered.

### vi.  Dr. Lazarus

Dr. Lewis A. Lazarus examined Alvarez in August 2004.
Alvarez contends that the ALJ misused Lazarus's report in two
ways, one of which is not a misuse, but the other of which
requires remand.

First, the ALJ stated, "there was no evidence of delusions,
hallucinations, or paranoia."  (A.R. 31 ¶ 6.)  Dr. Lazarus stated
that Alvarez told him about delusions, hallucinations, or
paranoia, but found that Alvarez's "thought processes were
coherent and goal directed" and that there was no evidence of
delusions, hallucinations, or paranoia "in the evaluation setting
itself."  (A.R. 200 ¶2.)  The ALJ did not mischaracterize Dr.
Lazarus's report; the ALJ was observing that Dr. Lazarus's
evaluation yielded no evidence of these symptoms.  That is true.
Whether Alvarez's testimony as to the existence of these symptoms
is credible is another matter, which the ALJ separately
considered.

However, the ALJ did err in omitting without explanation Dr.
Lazarus's finding that Alvarez does not cook or prepare food
because of forgetfulness, that he is not capable of managing his
own funds, and that he has trouble regularly taking his

medication because he sometimes forgets the prescribed dosage.
(A.R. 201.)  These findings are inconsistent with the ALJ's
assessment that Alvarez has only mild limitations on his
activities of daily living, a finding which was apparently based
on the lack of evidence in the record rather than a weighing of
competing evidence.  (A.R. 34-35.)

On remand, the ALJ should weight Dr. Lazarus's testimony
regarding Alvarez's activities of daily living.


b.  Credibility

The ALJ did not credit Alvarez's testimony regarding the
extent and severity of his impairments based on five reasons: (1)
Alvarez gave conflicting information about the grade in school he
attained; (2) the ALJ believed that Alvarez contradicted himself
with respect to his language abilities according to Dr. Bogacki's
report; (3) Dr. Bogacki stated that Mr. Alvarez's attitude and
effort on testing was very questionable; (4) Alvarez purportedly
contradicted himself with respect to the effect of his
medications on his panic attacks; and (5) Alvarez's statements
about his physical limitations and hearing voices were not
supported by the objective medical evidence.

Some of these reasons are plainly incorrect.  Alvarez did
not, in fact, contradict himself about his English skills in
front of Dr. Bogacki; he merely stated that he spoke Spanish

better than English, not that he spoke no English.  Nor did
Alvarez contradict himself about his panic attacks; Alvarez
testified that the frequency of the panic attacks "lessened" when
he was compliant with medication, but since the "lessened"
statement was not made against any particular baseline, it may
have reduced the attacks to four per week (rather than from for
per week).  Additionally, as previously mentioned, the ALJ
erroneously ignored the opinions of Dr. Lazarus and Nurse Martin
with respect to limitations that may go to some of the ALJ's
conclusions about the conflict between Alvarez's testimony and
the supporting evidence.  Because it is unclear if the ALJ would
have reached the same conclusion without these errors, on remand
the Court instructs the ALJ to reconsider his credibility
finding.

In particular, the ALJ should carefully address issues
identified by the regulations as being relevant when a claimant
suggests a greater severity of impairment than is shown by the
objective medical evidence alone. Among other things, the
Regulations call for consideration of "the type, dosage,
effectiveness, and side-effects of medications taken to alleviate
pain or other symptoms."  20 C.F.R. § 404.1529(c)(3)(i-vii); SSR
96-7p.  This was a critical issue in this case since the ALJ
relied heavily on the ameliatory effect of the drugs, but did not
consider in any depth the side effects or Alvarez's ability to

comply with the medication regimen.  The efficacy of psychiatric medication cannot be evaluated without considering its side effects and the patient's ability to comply.  This assessment should also be made upon remand.

## IV.  CONCLUSION

For the reasons stated above, this Court will vacate the Commissioner's decision and remand the case for further consideration by the Administration in light of this decision. The Court expresses no views as to the ultimate outcome.  The accompanying Order will be entered.


**June 28, 2011**                              **s/ Jerome B. Simandle**
Date                                   JEROME B. SIMANDLE
                                       United States District Judge

26